## Supreme Court—General Term—Third Department.

*November*, 1888.

## PEOPLE *v.* PAVLIK.

CRIMINAL CONSPIRACY.—EVIDENCE ABSENCE OF MOTIVE OF CRIME.—EVIDENCE OF GOOD CHARACTER.

In a close or doubtful case great weight should be attached to evidence of the good character of the defendant.

Lack of motive for the crime is an important consideration as bearing upon the probability in regard to defendant's guilt, especially so in a case mainly depending upon circumstantial evidence.

The law requires more than an inference and inconclusive circumstances to charge a prisoner with having joined a conspiracy to perpetrate a grave crime,—*i. e.*, murder.

Where the evidence is insufficient to prove a conspiracy, evidence of the acts or declarations of the alleged co-conspirator, performed or uttered when the defendant was not present, or, if present, not participating therein, or in some manner assenting thereto, is inadmissible against defendant.

In the absence of sufficient proof of a conspiracy evidence that blood was found upon the ·clothes of an alleged co-conspirator in a conspiracy to murder is inadmissible against defendant.

Appeal from a judgment entered upon the conviction of the defendant Maycek Pavlik, at a Court of Oyer and Terminer of the County of Saratoga, for the crime of murder in the second degree.

The facts appear in the opinion.

*Edwin Quackenbush*, for defendant, appellant.

*T. F. Hamilton*, district attorney, for the people, respondent.

INGALLS, J.—The prisoner and Cabris Robinski were jointly indicted for the murder of Thomas Maika on July

23, 1887. The prisoners elected to be tried separately, and Robinski was first tried, and the jury disagreed, and he offered to plead guilty to murder in the second degree, which was accepted, and he was sentenced to the State prison for life. Pavlik was soon thereafter tried and convicted, and sentenced to the State prison for life, and has appealed to this court from such conviction. We have carefully examined the case, and have reached the conclusion that the evidence was insufficient to establish a conspiracy between Pavlik and Robinski to murder Thomas Maika. The evidence of the prisoner, and of Robinski, negatives the theory of the prosecution that Maika was murdered as the result of such conspiracy. Indeed, their evidence is to the effect that Pavlik in no manner participated in such homicide.

It is true the testimony of such witnesses is to be accepted with grains of allowance, as one had been convicted of a criminal offense of high grade; and the other testified in his own behalf. The prisoner produced witnesses who were respectable, and who were acquainted with him, and they spoke favorably in regard to his character, and he was entitled upon the trial to the full benefit of such evidence, and upon this review such consideration is not to be lost sight of. Indeed, in a close or doubtful case, great weight should be attached to evidence of good character. People *v.* Lamb, 2 *Keyes*, 360, 378; 2 *Abb. N. S.* 148, 165; Cancemi *v.* People, 16 *N. Y.* 501.

The prisoner and Robinski were together at Mechanicville the evening of the day the murder was committed, and while there, visited several saloons and drank beer, and separated about ten o'clock, and were not seen together by any person, so far as the evidence discloses, until nine o'clock in the morning of the following day, unless their identity can safely be inferred from the evidence of the following named witnesses, who were produced and examined for such purpose by the prosecution.

O'Brien testified that he was upon the front stoop of his dwelling-house and heard two men whispering in a foreign

tongue, and, so far as he saw, one was taller than the other, and to the best of his ability to say, the little one had a light-colored hat on, that he got a glimpse of him as he was going up the road.

Michael Butler, another witness, testified in substance, that upon the night in question his horse was under Shaunt's mill-shed at Mechanicville ; that he went to get his horse about nine o'clock, and after a little delay started for home, going up the brick road; that he knew Thomas O'Brien, and where he resided, which was near the place where the body of Maika was found ; that when near the house of O'Brien he saw two men; one was taller than the other ; and to the best of his ability to say, one had on a light hat, it looked light-colored ; might have been a black hat with something over it; looked to him like a light hat; that he was driving pretty fast, and when he came up to where they were he slacked up, and the big fellow came out on the right-hand side of the road, and the little fellow on the left-hand side of the road ; that it was a kind of dark night; heard of the murder Sunday morning.

Butler, another witness, testified that he saw nothing; but Sunday morning, a little after daylight, he heard a couple of men passing by talking very loud in a foreign language, one of whom he thought to be Pavlik.

Carpenter, another witness, testified that the night of the murder, when returning from Mechanicville, he saw two men lying under an apple-tree, and could not describe them ; so far as he could say they lay still and did nothing; that he did not notice their hats ; that it was a dark night, and he could not tell whether one was shorter than the other.

James Devoe, another witness, testified that he saw two men crossing his meadow, and it was so early in the morning that he could not distinguish the color of their hats or clothes.

The witness Beadleson testified that he was acquainted with Pavlik, who had worked for him ; that the barking of his dog awoke him about half-past three o'clock in the morn-

ing, and he saw two men going past the Best house, and in the direction of the Sutfin house, or the Dallas Clark farm; the two men wore black hats, and he could not say who they were.

Martha Sutfin, another witness, testified that she knew Pavlik, who had worked for her seven months; that she saw him and another man, whom she did not know, pass her house between four and five o'clock Sunday morning; Pavlik had a light-colored hat on; they were talking loud in a foreign language. The evidence of this witness does not seem to be, in this respect, materially in conflict with the version given by the prisoner, who stated that he and Robinski left Mehan's saloon Saturday evening at five or six minutes past ten o'clock, and proceeded together to the bridge over the canal, where they separated, Pavlik saying that he was going to Maika's, and Robinski saying that he was going home.

That he went to Maika's and purposed to stay all hight, but Mrs. Maika, owing to the absence of her husband, was not willing to allow him to stay, and he went away; that he started for Clark's, where he worked, and on his way encountered a wire fence, which he could not get over, and he lay down beside it and slept till morning, and when he awoke he started for Clark's, and when on the way, a countryman of his, who was a stranger, accosted him, and expressed a desire to obtain employment, and Pavlik and he conversed upon the subject, as they traveled along together. It does not seem improbable but that they were the men whom Martha Sutfin saw, and recognized one as Pavlik.

Mrs. Maika testified that Pavlik came to her house Saturday evening about nine o'clock as she stated the time, and inquired for her husband, and stated that if he were at home he would ask permission to sleep there.

Dallas Clark testified that Pavlik was in his employ, and that he returned to the house that Sunday morning about five o'clock, and soon thereafter went to the barn to milk the cows, and take care of the horses, and that he took

breakfast at the house; that Robinski came there that morning about nine o'clock and inquired for Pavlik.

The witness Clark further stated that Robinski had worked for him, taking care of the horses. In regard to the watch Robinski stated that when in the stable he wrapped the watch in a rag, which he found there, and placed it in the hay-mow, and that Pavlik knew nothing about it.

Pavlik testified that he knew nothing in regard to the watch until after it had been placed in the mow, and that some time after Robinski told him about it.

We discover no evidence which conflicts with such statements. Furthermore, we are unable to perceive from the evidence, any adequate motive which Pavlik could have had, which would be likely to induce him to participate in the murder of Maika. They seem to have been friends. Pavlik had boarded with Maika before he entered the employment of Clark, and was in the habit of visiting Maika's frequently, and occasionally passed the night there. The evidence does not disclose that they had had any serious controversy; on one occasion when Pavlik was at Maika's house he become noisy, and Maika told him to be still or he would wake up the child, and if he was not quiet he would put him out of the house. Pavlik raised a chair and Maika procured a stick; no blows were exchanged, and the matter ended. We fail to discover in the case any evidence that Pavlik entertained any malice towards Maika. Some prominence is sought to be given by the prosecution, to the fact that upon the day of the homicide, Pavlik did not join Maika in drinking beer. The latter invited the former to drink, which was declined without any reason being assigned, and we perceive nothing which indicates that he refused on account of any feeling of unkindness.

Nor are we able, under the circumstances, to attach much importance to the remark made by Maika to Pavlik: "Go on back to Mechanicville; you did not get beer enough yet." It was a coarse remark, which did not necessarily imply any unkind feeling on the part of Maika, nor does it

appear that it was regarded by Pavlik in that light. Indeed, the evidence shows very clearly that the interview at Maika's house, between them on the day of the homicide, was very friendly. Mrs. Maika testifies in regard thereto, as follows: " Pavlik and my husband went the first time from my house, Saturday, July 23, at twelve o'clock; they went away pleasantly, and returned pleasantly together; they eat dinner pleasantly together and were talking good together, there was nothing talked about going to Dallas Clark's farm till after dinner; they were talking pleasant; he (defendant) says, ' You come back with me to the farm,' and he (husband) says, ' No, I want to go to bed,' and he says, ' Here, you've got time enough to sleep at night.' When they returned at three o'clock they were social." " Q. Social from drink? A. I don't know whether they were drinking or not; they were not drunk."

From a careful examination of the facts of this case, we have reached the conclusion that the evidence fails to establish a conspiracy formed by Pavlik and Robinski to murder Maika. The evident want of motive on the part of the prisoner to commit such crime is, we think, an important consideration as bearing upon the probability in regard to his guilt, especially so in a case depending mainly upon circumstantial evidence for its support. The law requires more than an inference drawn from doubtful and inconclusive circumstances, to charge a prisoner with having joined in a conspiracy to perpetrate a crime of such magnitude, and involving such severe punishment. Ormsby *v.* People, 53 *N. Y.* 472; Cuyler *v.* McCartney, 40 *Id.* 222; People *v.* Davis, 56 *Id.* 96. The evidence being insufficient to establish such conspiracy, evidence of the acts or declarations of Robinski, performed or uttered when Pavlik was not present, or if present and not participating therein, or in some manner assenting thereto, was not admissible against the prisoner. Ormsby *v.* People, *supra;* Jones *v.* Hurlbut, 39 *Barb.* 403. At page 409, Justice WELLS remarks:

"Before evidence of the acts and declarations of persons not parties to the action can be properly received in evidence in cases of this character, the common unlawful design should be clearly proved as a condition precedent to receiving evidence of such acts and declarations at all. Evidence which is merely admissible on the question of the common illegal purpose, is not sufficient. The common purpose must be clearly proved. Evidence which might be sufficient to submit to a jury on a question proper to be submitted to them, will not answer the requirement. It should be so strong as to make it their imperative duty to find in the affirmative if the question was to be submitted to them, or where the court would set their verdict aside in case they did not so find," etc. *Barb. Crim. Law*, p. 229.

Certainly such rule should not be relaxed in its rigor, when applied to a case like the present, in which such grave consequences are involved. We are constrained, by the facts disclosed, to conclude that such rule was not sufficiently adhered to upon the trial, and that in consequence thereof the case of the prisoner may have been prejudiced. In the evidence of Ludwina Carroll is contained the following relation of a transaction between Robinski and Maika, when Pavlik was not present, and the evidence does not justify the presumption that he heard any part of the transaction. Her evidence is as follows in relation thereto:

"Q. Did Cabris come back again? A. Cabris came about two o'clock. He said, he wanted his bed; and Maika says: 'You will please go in the other room, because Ludwina is in there and has got a headache and it is cooler;' Cabris said: he would not; he wanted his own bed, and he said: 'The other bed is just as good as this one.'

"Q. What did they do then? A. He was walking around swearing and talking and going out." (Defendant's counsel objected as incompetent.)

THE COURT.—"It is an act done at a time when they

were both there." (Objection overruled. Defendant excepted.)

" Cabris went out, and Maika got up and locked the door. He came about half past three and said ' he wanted his own bed,' and Maika told him just the same; he said ' he would not;' he swore and walked around and said ' he was going to pull me out of bed,' and Maika said, ' you will not,' and Maika took Cabris out of doors and licked him.

" Q. How do you know he licked him? A. Noise.

" Q. What did you hear Cabris say? A. He said ' Thomas, Thomas, stop.' Mrs. Maika went out doors and said : ' Thomas, come in the house,' and I heard Cabris say : ' G——d d——n, I give you that back pretty soon ;' I heard him talking more, but I can't hear what he say ; Cabris went away."

Pavlik may have been in the house, and if so was 'in another room, probably asleep at that hour of the night. The narration of such an occurrence would be likely to impress the minds of the jurors. This witness was allowed to state a conversation between herself and Robinski in the kitchen at Maika's as follows : " And I went to the kitchen and says to him (Robinski) what makes you make such a racket all night ? and he swore and said ' G——d d——n, you won't come any more to this house; and Maika this is the last time he fights with me; he will not fight anybody in this house any more.' " The witness testified that Pavlik was in the house, and the door was open, but there is no proof that he had heard the remark which was made by Robinski. People v. Holfelder, 5 N. Y. Crim. Rep. 179.

Again, the witness Robinski was allowed to state a conversation between himself and Robinski in regard to an occurrence on the Sunday previous to the homicide, as follows :

" A. Sunday morning, after Robinski had been licked by Thomas, Robinski came to witness' house and said to him that he had the headache; Maycek was present, and I said

' What is the matter with you ?   You are drunk, I suppose,' and he said, ' But Maika licked him.'   And Robinski told me that he wanted to get in his room and Maika would not let him because two people were sleeping there, and Maika was laying on the floor with his wife, and Robinski said 'He did not want that Maika should lay on the floor.' Maika wanted Robinski to sleep in his bed and Maika would sleep with his wife on the floor, and Robinski objected to that."

Defendant's counsel moved to strike out this last statement.   Motion entertained.

"Q. Was Maycek present during this time ?   A. Yes, sir.

"Q. What did Maycek say ?   A. He did not say anything at that time."

It is true Pavlik was present, but said nothing, and was not called. upon to speak, as the conversation was not addressed to him, and the transaction referred to was between Maika and Robinski.   The same witness was permitted to state another declaration of Robinski to him as follows :  " We will go one night when Maika goes to work and throw him into the canal and let him float to Troy or New York."   The witness stated that Pavlik was present, but said nothing.   All such declarations, made by Robinski, and admitted as evidence against the prisoner upon the ground that a conspiracy had been established on that evidence in support thereof had been given sufficient to justify the submission of such question to the jury, was well calculated to prejudice the case of the prisoner with the jury. The prosecution was allowed to show that blood was found upon the clothing of Robinski, and such clothes were exhibited to the jury.   We fail to perceive upon what ground such evidence could be introduced against this prisoner. The counsel for the prisoner, at various stages of the trial, resisted the allowance of that class of evidence, and finally made a motion to strike out the evidence of the acts and

declarations of Robinski in the absence of Pavlik, which was denied by the court.

The following remark: "Blood of a dog, when I gave him one with a stone he had enough," sworn to by the wit-ness Maggie Bidus as having occurred at the office of Justica Massey, was denied by the prisoner and explained by him as a remark made in regard to the stone which was thrown at the prisoners by Maggie Bidus, and which she did not deny throwing. Robinski substantially corroborates Pavlik in such statement. The witness Bidus was the sister of Mrs. Maika, and her evidence does not present her in a very favorable light.

Without further discussion of the facts and incidents of the trial, we have become satisfied from a careful considera-tion of this case that the conviction of the prisoner does not rest upon satisfactory evidence of his guilt, and that a new trial should be accorded him, so that another jury may pass upon his case on a trial further removed from the excite-ment which must have accompanied the discovery of the homicide, and the trial of Robinski, who, according to his own evidence, alone perpetrated the crime.

LEARNED, P. J., and LANDON, J., concur.

NOTE.—As to declarations of co-conspirators see People *v.* Squire, 6 *N. Y. Crim. Rep.* 475.